UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

YAMIKA LY VEGA OLMEDA O/B/O J.W.,

    Plaintiff,

    v.

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.

18-CV-1177
DECISION & ORDER

---

On October 25, 2018, the plaintiff, Yamika Ly Vega Olmeda, brought this action under the Social Security Act ("the Act") on behalf of her minor child, J.W. She seeks review of the determination by the Commissioner of Social Security ("Commissioner") that J.W. was not disabled. Docket Item 1. On December 18, 2019, Vega Olmeda moved for judgment on the pleadings, Docket Item 15; on January 22, 2020, the Commissioner responded and cross-moved for judgment on the pleadings, Docket Item 22; and on February 10, 2020, Vega Olmeda replied, Docket Item 23.

For the reasons stated below, this Court grants Vega Olmeda's motion in part and denies the Commissioner's cross-motion.[1]

## **STANDARD OF REVIEW**

"The scope of review of a disability determination . . . involves two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). The court "must first

---

[1] This Court assumes familiarity with the underlying facts, the procedural history, and the ALJ's decision and will refer only to the facts necessary to explain its decision.

decide whether [the Commissioner] applied the correct legal principles in making the determination." *Id*. This includes ensuring "that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the Social Security Act." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)). Then, the court "decide[s] whether the determination is supported by 'substantial evidence.'" *Johnson*, 817 F.2d at 985 (quoting 42 U.S.C. § 405(g)). "Substantial evidence" means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to correct legal principles." *Johnson*, 817 F.2d at 986.

## DISCUSSION

**I.     ALLEGATIONS**

Vega Olmeda argues that the ALJ erred in finding that J.W. did not have marked limitations in at least two functional domains and that J.W.'s impairments therefore did not functionally equal any of the childhood disability listings. Docket Item 15-1. More specifically, she argues that the ALJ erred in finding that J.W. had less than marked limitations in the domains of health and physical well-being, *id.* at 12-16, acquiring and using information, *id.* at 16-20, and interacting and relating with others, *id.* at 20-21.

2

This Court agrees that the ALJ erred and, because that error prejudiced Vega Olmeda, remands the matter for proper consideration of J.W.'s functioning in the areas of health and physical well-being, acquiring and using information, and interacting and relating with others.

## II. ANALYSIS

### A. Health and Physical Well-Being

Vega Olmeda first argues that the ALJ erred in finding that J.W.'s sickle cell disease results in less than marked limitations in the domain of health and physical well-being. Docket Item 15-1 at 12-16. This Court agrees.

A child is disabled if she has a condition that meets, medically equals, or functionally equals a specific disability listing. 20 C.F.R. § 416.924(d). Functional equality means that the child's impairments, considered together, result in a "marked" limitation in at least two of the six functional domains or an "extreme" limitation in at least one. *Id.*

In the domain of health and physical well-being, a child has a "marked" limitation if he or she frequently is ill as a result of his or her impairments or exhibits frequent worsening of symptoms resulting in medically-documented exacerbations. *Id.* § 416.926a(e)(2)(iv). "Frequent" means episodes that occur on average every four months and last two weeks or more, or that occur more often than three times a year but last less than two weeks, or that occur less often but are of overall equivalent severity. *Id.* A child has "an "extreme" limitation if the child frequently is ill or if impairments frequently become exacerbated, resulting in medically documented symptoms significantly more than those of a "marked" limitation. *Id.*

§ 416.926a(e)(3)(iv). To determine the severity of a child's limitations in a given domain, the ALJ considers functional limitations that result from all impairments, including impairments that have been deemed not severe, and their cumulative effects. *Id.* §§ 416.923, 416.924a(b)(4), 416.926a(a), (c), and (e)(1)(i).

Here, the ALJ found that J.W. had a "less than marked" limitation in the area of health and physical well-being. Docket Item 9 at 33-34. The ALJ explained that "[t]he record is consistent with a history of hospitalizations for sickle cell [disease] related pain, but the great majority of these hospitalizations, as well as other treatment notes, have noted largely unremarkable physical examination findings, and such visits have not required parenteral narcotics or blood transfusions." *Id.* at 34. But in reaching that conclusion, the ALJ conflated the standard for determining whether a claimant meets the specific criteria for childhood disability listing 107.05 with the standard for determining whether a claimant has a marked limitation in the domain of health and well-being.

For a child to meet the criteria for Listing 107.05, which covers sickle cell disease, she must demonstrate one of the following:

> (A) Documented painful (vaso-occlusive) crises requiring parenteral (intravenous or intramuscular) narcotic medication, occurring at least six times within a 12-month period with at least 30 days between crises[; or]
>
> (B) Complications of hemolytic anemia requiring at least three hospitalizations within a 12-month period and occurring at least 30 days apart. Each hospitalization must last at least 48 hours, which can include hours in a hospital emergency department or comprehensive sickle cell disease center immediately before the hospitalization [; or]
>
> (C) Hemoglobin measurements of 7.0 grams per deciliter (g/dL) or less, occurring at least three times within a 12-month period with at least 30 days between measurements[; or]

4

> (D) Beta thalassemia major requiring life-long RBC transfusions at least once every 6 weeks to maintain life.

20 C.F.R. Part 404, Subpart P, app. 1 (citations omitted). So a child is disabled if she meets any one of these criteria. As noted above, however, satisfying one of these criteria is not the only way that a child with, for example, sickle cell disease could be found disabled. If a child does not meet any of these specific listing criteria, she nevertheless would qualify as disabled if her impairments—considered together—result in either an extreme limitation in one functional domain or marked limitations in at least two different domains. *See* 20 C.F.R. §§ 416.924(d), 416.923, 416.924a(b)(4), 416.926a(a), (c), and (e)(1)(i).

The ALJ's analysis in this case erroneously used the listing 107.05 criteria to determine whether J.W. had a "marked" limitation in the domain of health and physical well-being. For example, the ALJ found that J.W. did not have a marked limitation because J.W.'s hospital visits did not require "parenteral narcotics or blood transfusions." Docket Item 9 at 34. Although Listing 107.05(A) requires narcotic medication and Listing 107.05(D) requires blood transfusions, the definition of a "marked" limitation includes no medication or procedure requirements. It looks instead to the frequency of illness and whether those episodes result in "medically-documented exacerbations." 20 C.F.R. § 416.926a(e)(2)(iv). Indeed, the very purpose of the *functional* domain analysis is to determine whether impairments that do not meet explicit medical criteria might still render a child disabled because those impairments significantly interfere with the child's ability to *function*. *See id.* § 416.926a(d) (explaining that, in deciding whether a child's "impairment(s) functionally equals the listings," an ALJ "will not compare [the child's] functioning to the requirements of any

5

specific listing."). The ALJ therefore reviewed Vega Olmeda's claim under an incorrect legal standard—demanding, in effect, evidence of "light" Listing 107.05, rather than evidence of frequent illness that affected J.W.'s ability to function.

The question then becomes whether this legal error was harmless. *See Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (declining remand where "application of the correct legal principles to the record could lead [only to the same] conclusion"). To answer that question, the Court asks whether J.W.'s extensive history of hospitalizations for sickle-cell-disease-related symptoms might have led an ALJ to find that J.W. "frequently" was ill as a result of the disease and therefore had a "marked" limitation in the area of health and well-being. The Court finds that indeed possible.

In September 2014, pediatric hematologist Steven Ambrusko, M.D., diagnosed then-three-month-old J.W. with sickle cell disease. Docket Item 9 at 471. Dr. Ambrusko prescribed penicillin and folic acid and "had an extensive discussion" with Vega Olmeda about the "potential complications [of the disease,] including the risk for bacteremia/infection and vaso-occlusive pain crises . . . and the requirement for emergent care for all fevers." *Id.* at 476.

Between December 2014 and June 2017, J.W. received emergent care 14 times for complications related to his sickle cell disease. *See id.* at 234 (December 2014), 414 (April 2015), 430 (April 2015), 438 (May 2015), 456 (June 2015), 556 (July 2015), 573 (January 2016), 583 (February 2016), 595 (March 2016), 611 (June 2016), 622 (July 2016), 649 (November 2016), 658 (January 2017), 220 (June 2017). Stated differently, between the ages of six months and thirty-six months, J.W. was hospitalized roughly once every two months. On one occasion, in December 2014, J.W. was found

6

to have experienced an intracerebral hemorrhage. *Id.* at 327, 538. On another, in June 2017, J.W. was hospitalized for four days until his pain subsided. *Id.* at 220-28. Those hospitalizations, considered together, might well qualify as exacerbations occurring either "more often than three times a year but last[ing] less than two weeks" or "less often but [being] of overall equivalent severity," *see* 20 C.F.R. § 416.926a(e)(2)(iv).

What is more, the record does not include any non-stale medical opinion supporting the ALJ's determination. In reaching his decision, the ALJ gave "moderate weight" to the April 2015 opinion of the non-examining consulting pediatrician, C. Nohejl, M.D., *id.* at 27 (citing *id.* at 55-59). Based only on a review of J.W.'s medical records through his nine-month well visit, Dr. Nohejl opined that J.W. had a less than marked limitation in the area of health and well-being. *See* Docket Item 9 at 27 (citing *id.* at 55-59). But by the time the ALJ rendered his decision in August 2017, J.W. had been hospitalized an additional thirteen times for complications related to sickle cell disease. Although the "mere passage of time does not render an opinion stale," *id.*, "significant developments" in an individual's medical history after the examination might. *Davis v. Berryhill*, 2018 WL 1250019, at *3 (W.D.N.Y. Mar. 11, 2018). That is what happened here, and "[a] stale medical opinion does not constitute substantial evidence to support an ALJ's findings," *Majdandzic v. Comm'r of Soc. Sec.*, 2018 WL 5112273, at *3 (W.D.N.Y. Oct. 19, 2018).

The ALJ's reliance on the non-examining consultant's opinion also ran afoul of his "duty to solicit" a "medical source statement [from a treating source] about what [J.W.] can still do despite [J.W.'s] impairment(s)." *See Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013) (summary order) (quoting former 20 C.F.R.

7

§ 416.913(b)(6)).[2] This requirement derives from the fact that the opinions of treating sources—physicians, psychologists, optometrists, podiatrists, and qualified speech-language pathologists who have "ongoing treatment relationship[s]" with claimants and therefore are best able to "provide . . . detailed, longitudinal picture[s] of [claimants'] medical impairments"—are entitled to "controlling weight" so long as they are "well-supported [sic] by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the claimant's] case record."[3] *See* 20 C.F.R. §§ 416.913(a) (2015), 416.927(c)(2) (2015); *see also Genier v. Astrue*, 298 F. App'x 105, 108 (2d Cir. 2008) (summary order). Because J.W. was receiving ongoing treatment from Dr. Ambrusko, the ALJ was obligated to request a medical source statement from him. There is no evidence that the ALJ did so, instead relying on the opinion of a consulting physician who never even examined J.W. in person.

In short, the ALJ applied the incorrect legal standard in determining whether J.W.'s sickle cell disease resulted in his having a marked limitation in the area of health

---

[2] Section 416.913(b)(6) was amended, effective March 27, 2017. Revisions to the Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 5844, 5875 (Jan. 18, 2017). Because Vega Olmeda applied for disability benefits starting on June 26, 2014—that is, before the date the changes became effective—her claim is governed by the prior regulation. *See id.* at 5844-46.

[3] Indeed, an ALJ may not give a treating source's opinion anything less than controlling weight unless he first "explicitly consider[s], *inter alia*: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and[ ] (4) whether the physician is a specialist." *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (quotations and alterations omitted). "An ALJ's failure to 'explicitly' apply [these] factors [before] assigning [less-than-controlling] weight" to a treating source opinion "is a procedural error." *Estrella v. Berryhill*, 925 F.3d 90, 96 (2d Cir. 2019) (quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam)).

and well-being, and this error was not harmless with respect to his finding in that domain. Because a finding of disabled requires that a child's impairments result in marked limitations in at least two domains, the Court therefore considers whether the ALJ erred in his findings concerning at least one other functioning domain.

### B. Speech and Language Delays

Vega Olmeda also argues that the ALJ erred in finding that J.W. had "less than marked" limitations in the domains of acquiring and using information and interacting and relating with others. Docket Item 15-1 at 16-21. She argues that J.W.'s delays in speech development result in marked limitations in both areas. This Court again agrees that the ALJ erred in his decision-making process.

"A child's problems with speech and language . . . need to be assessed in both the 'acquiring and using information' domain as well as the 'interacting and relating with others' domain, rather than simply in the [former] 'cognition/communication' area of functioning." *Kittles ex rel. Lawton v. Barhart*, 245 F. Supp. 2d 479, 489 (E.D.N.Y. 2003). Indeed, the Commissioner's regulations elaborating on the age-group[4] developmental milestones in each of those domains refer multiple times to a child's speech and language development.[5]

---

[4] J.W. was considered a "newborn/young infant" at the time Vega Olmeda filed her claim for disability benefits. *See* Docket Item 9 at 148, 151; 20 C.F.R. § 416.926a. At the time the ALJ denied the claim, J.W. was considered a "preschooler," which is J.W.'s current classification. *See id.*

[5] *See* 20 C.F.R. § 416.926a(g)(2)(i) (explaining that to be considered age-level in the domain of acquiring and using information, young infants "should . . . recognize and gradually attach meaning to everyday sounds, as when [they] hear the telephone or [their] name[s]. Eventually, [they] should recognize and respond to familiar words, including family names and what [their] favorite toys and activities are called."); 20 C.F.R. § 416.926a(g)(2)(ii) (explaining that to be considered age-level in the domain of

9

Notwithstanding these clear directives, the ALJ in this case failed to consider J.W.'s speech and language delays in evaluating his functional limitations in the domain of acquiring and using information. In finding that J.W. had no limitations in this domain, the ALJ explained that Early Intervention Program "documentation and testing results of record demonstrate age-appropriate cognitive development." *Id.* at 28. He continued:

> [T]he evidence of record does not demonstrate any significant impairment. [Early Intervention Program records] indicate[ ] that [J.W.] possessed age-appropriate cognitive skills . . . . [J.W.] could complete simple puzzles, uncover hidden objects, understand pointing, use a few everyday items, activate a mechanical toy, retrieve objects, and spontaneously label on object.

---

acquiring and using information, older infants and toddlers should "understand that words represent things, and that words are simply symbols or names for toys, people, places, and activities. [They] should refer to [themselves] and things around [them] by pointing and eventually by naming. . . . [They] should begin to respond to increasingly complex instructions and questions, and to produce an increasing number of words and grammatically correct simple sentences and questions."); 20 C.F.R. § 416.926a(g)(2)(iii) (explaining that to be considered age-level in the domain of acquiring and using information, preschoolers "should begin to learn and use the skills that will help [them] to read and write and do arithmetic when [they] are older. For example, listening to stories, rhyming words, and matching letters are skills needed for learning to read. . . . Using words to ask questions, give answers, follow directions, describe things, explain what [they] mean, and tell stories allows [them] to acquire and share knowledge and experience of the world around [them]."); *see also* 20 C.F.R. § 416.926a(i)(2)(i) (explaining that to be considered age-level in the domain of interacting and relating with others, young infants "should begin to form intimate relationships at birth by gradually responding visually and vocally to [their] caregiver(s), through . . . vocal exchanges . . . . [They] should begin to develop speech by using vowel sounds and later consonants, first alone, and then in babbling."); 20 C.F.R. § 416.926a(i)(2)(ii) (explaining that to be considered age-level in the domain of interacting and relating with others, older infants and toddlers "should be able to spontaneously communicate [their] wishes or needs, first by using gestures, and eventually by speaking words clearly enough that people who know [them] can understand what [they] say most of the time." ); 20 C.F.R. § 416.926a(i)(2)(iii) (explaining that to be considered age-level in the domain of interacting and relating with others, preschoolers "should be able to socialize with children as well as adults. . . . [They] should be able to use words instead of actions to express [themselves] . . . . [They] should be able to initiate and participate in conversations, using increasingly complex vocabulary and grammar, and speaking clearly enough that both familiar and unfamiliar listeners can understand what [they] say most of the time.").

10

Docket Item 9 at 25. The ALJ never even mentioned J.W.'s significant language development delay in addressing this domain.

The ALJ's failure to consider J.W.'s speech and language delays in determining his ability to acquire and use information was a legal error. The question then is whether that error was harmless. *See Zabala*, 595 F.3d at 410. To answer that question, the Court asks whether considering the effect of J.W.'s speech and language delays on his ability to acquire and use information might have led the ALJ to find that J.W. had a marked limitation in that domain. The Court finds that indeed possible.

In May 2015, when J.W. was 22-months old, Lori Petersen, M.S. Ed., and Corinne Helms, M.S., C.C.C./S.L.P., tested J.W.'s language development using the Preschool Language Scale, Fifth Edition ("PLS-5"). J.W.'s receptive language skills fell within the 21st percentile of age-group peers; J.W.'s expressive language skills fell within the 45th percentile; and J.W.'s speech production and pragmatic speech skills and were within normal limits. *Id.* at 713-14. Based on this finding and on their observations of J.W., Ms. Helms and Ms. Petersen concluded that J.W. was not eligible for Early Intervention Program services and supports. *Id.* at 715.

In January 2017, Ms. Helms and Ms. Petersen re-evaluated J.W. J.W.'s results on the PLS-5 placed J.W. in the 25th percentile for receptive language development and the 2nd percentile for expressive language development. *Id.* at 753. The latter result was more than two standard deviations below the mean and indicated delayed development. *Id.* Ms. Helms and Ms. Petersen also found that J.W.'s speech production and pragmatic speech skills were "delayed commensurate with overall language delays." *Id.* at 754. The evaluators observed that J.W. had a "vocabulary of

11

fewer than 30 words by 24 months of age; limited variety in babbling structure; [and] few spontaneous imitations." *Id.* at 755. Based on J.W.'s delayed language development, Ms. Helms and Ms. Petersen recommended that J.W. receive Early Intervention Program services. *Id.* at 755. Later that month, J.W. began once-weekly speech language therapy. *Id.* at 669-76.

The ALJ gave these opinions "moderate weight" but still found that J.W. had no limitation in the domain of acquiring and using information and only a less than marked limitation in the domain of interacting and relating with others. *Id.* at 27-28. The ALJ's conclusion was based largely—and erroneously—on his uncertainty about the completeness of those opinions: "[T]he recent medical record and [Early Intervention Program] records indicate communicative limitations related to [an] expressive language delay. Nevertheless, the record is unclear concerning how long this delay is likely to last, and [J.W.] has otherwise demonstrated normal eye contact and age-appropriate social skills." *Id.* at 31.

When an ALJ identifies a gap in the administrative record, the ALJ is under an affirmative obligation to fill that gap. *See generally Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996)) ("Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." (citing *Echevarria v. Sec'y of Health & Human Servs.*, 686 F.2d 751, 755 (2d Cir. 1982)). Here, the ALJ not only recognized the significant expressive language delay found by Ms. Helms, a certified speech and language pathologist, but he also explicitly noted a critical gap in Ms. Helms's report. Instead of taking steps to fill that gap, however, the ALJ construed it against J.W.

To be sure, and contrary to Vega Olmeda's assertions J.W.'s speech and language delays do not *automatically* qualify J.W. as having a marked limitation in either domain. Only J.W.'s expressive—not J.W.'s receptive—language skills fell more than two standard deviations below the mean. *Cf.* 20 C.F.R. § 416.926a(e)(2)(iii) ("[W]e will find that you have a 'marked' limitation when you have a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a *comprehensive* standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score." (emphasis added)). Nevertheless, J.W.'s speech and language delays were significant, and the ALJ's failure to develop the record on these delays renders his findings in the two domains that consider speech and language development—acquiring and using information and interacting and relating to others—not supported by substantial evidence.

In short, the ALJ erred in determining whether J.W. had limitations in the domains of acquiring and using information and interacting and relating with others, and these errors were not harmless. Based on this finding and on the Court's earlier finding of prejudicial error with respect to J.W.'s functioning in the domain of health and physical well-being, this Court concludes that there is a distinct possibility that a legally-correct evaluation of J.W.'s impairments could result in a finding of at least marked limitations in at least two functioning domains—that is, in a finding that J.W. is disabled.

This Court therefore remands the matter for reconsideration of J.W.'s functioning in the areas of health and well-being, acquiring and using information, and interacting with others. On remand, the ALJ should fill gaps in the record to ensure that a non-stale

13

opinion from a treating source sheds light on J.W.'s functioning in the domain of health and well-being.  The ALJ also should recontact Ms. Helms to clarify the expected duration of J.W.'s significant expressive, productive, and pragmatic speech delays, and should address whether these delays constitute at least marked limitations in the domains of acquiring and using information and interacting and relating with others.

## CONCLUSION

For the reasons stated above, the Commissioner's motion for judgment on the pleadings, Docket Item 22, is DENIED, and Vega Olmeda's motion for judgment on the pleadings, Docket Item 15, is GRANTED in part and DENIED in part.  The decision of the Commissioner is VACATED, and the matter is REMANDED for further administrative proceedings consistent with this decision.


SO ORDERED.

Dated: April 6, 2020
Buffalo, New York


 */s/ Lawrence J. Vilardo*
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE